A final case of the morning. Council can approach in number 25 1066 IBEW versus Energy Harbor Nuclear. Take a moment to get yourself settled and then the council may approach the lectern. Please. Thank you, your honor. May it please the court. My name is Eric based and I am counsel for the appellant Energy Harbor Nuclear Operation Corporation, now known as Vista Nuclear Operations Company. It's a mouthful. And I would like to reserve five minutes. Great rebuttal. This is a simple question. Can a dispute that arises outside of collective bargaining agreement and the grievance arbitration provisions contained therein be mandated to arbitration? Because excuse me, counsel right there. Can I ask you, how is it outside? Can you explain to us outside? I can, your honor. The issue involves an agreement that was negotiated in the bankruptcy. It's called the framework agreement. There is no other source of rights that would allow the union to obtain payment of a health benefit from its former employer, because that's what happened. The framework agreement ended up providing for one year that the company would use the rates of a former employer and a separate health care plan with different experience levels and different actuarial determinations. That was what was used to create the amount of money that was paid for the opt out plaintiffs. Then in 21, the parties negotiated the framework agreement away. It's gone. It's disappeared. So there is no source and nothing in either a side agreement or in the collective bargaining agreement that talks about the framework agreement or any payment that was authorized through the framework agreement. That's why it's not part of the collective bargaining agreement. And the arbitration. The arbitration is not under the current agreement. The arbitration relates back. That's correct. To the framework agreement. That's correct. And in fact, beyond that, the arbitrator was asked to extend the agreement, to extend the decision relating to the prior agreement and the framework agreement, the prior collective bargaining agreement, to 2022. And she denied that. She told the parties negotiated, which they did. They negotiated it away. I was at the table. We negotiated that away. And so it was gone. It's not in any of the side agreements. The party spent more than six months reviewing side agreements as they negotiated the first agreement coming out of bankruptcy. And it's not in that anywhere in those documents. The grievance mentions explicitly as a reference. Section eight. C2A. Isn't that a provision from the CBA? It is, but it's completely inapplicable to the dispute. And if if I could explain why, I'd be happy to do that. So that provision is so there's a unique, at least somewhat unique relationship where the company has health care plan and section eight or article eight allows for the union employees to opt out of the plan. If they opt out of the plan, the company pays to the plan. Excuse me. Just just for clarification. Sure. Say the employees that that is all of that is as a local. Correct. That's correct. I believe, although I think it is possible for an individual on the local to avoid that. But it has been historically the entire local. So the local ops out. It has its own insurance and the company pays the contribution amounts that it would have paid to someone in the plan to the union. That is independent of the framework agreement that was in place before the company went into bankruptcy. That was what was negotiated to stay remain in place when the parties agreed to maintain that that procedure. And so any increase the other part of that is. So if you negotiate in twenty twenty one and the rates are fifty dollars in twenty twenty two, if the rates go to fifty five dollars. All that article says is the company has to also pay the fifty five dollars for the opt out union employees. That didn't even happen. There was no increase from twenty one to twenty two. But if there had been, that would not have made this an arbitrable issue because that's independent of the framework obligations which disappeared. OK. All right. What's the difference between what Energy Harbor paid for health care plan in twenty twenty two and what it paid in twenty twenty one? They're identical. You're on. OK. Does the collective bargaining agreement explain how we determine the base contribution for benefits here? Twenty twenty two. Is it the rates that were effective January one, twenty fourteen? You know, so that's that's historical language. And what happens is the rates are determined the year before there is a rollout, if you were. Well, I think it's in August and in August it's announced that in the following plan year. So in twenty twenty one in the fall, their plan, here's the twenty two plan year rates. And so based on those rates, they have a negotiated ratio. This amount goes to the contribution. If you're an opt out, opt out employee, you get that as well. Did the arbitration award ever change the premiums that had to be paid for Energy Harbor's health plan or was it limited to the union place opted out? It was limited. The premiums were not changed at all. And the two to two unions, there are 11 unions, 10 unions there. The two unions that challenged were both opt out unions. Can I continue or do you have a question? Sorry, I look like I could tell whether you were going to ask a question or not. I've covered a lot of what I was going to say, but I think it's also important to note that when the 20 the new agreement was negotiated for twenty one to twenty five plan year or years that it had a zipper clause as well. So not only were the was the framework agreement taken out of any kind of effect, there's a zipper clause that says the only thing that matters is what's in the CBA and what are in the side agreements that were specifically referred to in that six month period. So the framework agreement is not part of that and it cannot be cannot fall under the arbitration provision. In addition, the framework agreement does not have its own arbitration provision. So there's no presumption of arbitrability. That's the second mistake the district court made. First was relying on article eight. Second was referring to this presumption of arbitrability that shouldn't exist. I mean, the reality is that agreement was standalone at that point in time and it was expired. In your opening brief, you state that the arbitration awards analysis focused exclusively on the framework agreement. That's at page seven of your brief. I'm wondering about that. The arbitration opinion quotes in full, again, article 8C2A of the previous CBA. And that is language identical to the same provision in the current CBA, which was cited in the grievance. And then, as my notes suggest, the arbitrator spent a number of pages calculating the correct company contributions to the union plans. So again, the arbitrator quotes the same language from article 8C2A of the CBA. So doesn't that show that the arbitration award did analyze the same CBA provision? I don't believe so, Your Honor. I think that was a result of testimony that was presented by both parties. Well, didn't it say it? Isn't that exactly what the arbitrator said in the award? Well, if I may, I think the point of what was happening for that particular time was the arbitrator, because the arbitrator ruled that the company had to use the previous company's rates, what was being discussed were what the rates of the plan for Energy Harbor were, and what the rates for First Energy were. There was actually evidence introduced by actuaries as to what the rates of the First Energy plan were. And that's what was applied. But you have to keep in mind, all of that's irrelevant once the framework agreement is extinguished. And it was extinguished as the effective date of the new collective bargaining agreement. So it had no impact going forward for 2022. All right. You have anything, Tony? No. All right. Unless you have anything further. Yeah, I'll save for rebuttal. Thank you. Thank you. Good morning, Your Honors, Counsel. May it please the Court, I'm Robert Eberle, appearing here on behalf of the Appalee IBEW Local Union No. 29. Before I talk about the appeal, I have to make a correction to the union's brief to this Court. On page 17, we cited to United Steel Workers versus Lucan Steel. There are actually two appellate decisions by this Court, two separate panels, involving those parties. And I conflated the volume and the page numbers. And so what appears there is incorrect. The citation should be to 969F2nd 1468, not 989, which is the second case involving those parties. And I apologize not only to the Court, but to the Court's clerks for that mistake. Thanks for your candor. Well, the citation had also omitted, and I noticed when I read the red brief, omitted the date of the decisions. Yes. And in fact, omitted the date of the decision and the list of authorities, too. Yes. I was trying to tell. Yes. Sorry about that. There's two different cases. The second one is 989F2nd 1468, or excuse me, 668. And they're both about substantive arbitrability, and I think that's where I got myself into trouble. I want to check. You don't take issue with the representations your friend just made. There was no increase between 2021 and 2022 here in premiums. We're talking about whether the 2021 base was too low in terms of contributions for that year, correct? I take issue with the characterization because, first of all, it's fundamentally irrelevant. Okay, but the fact, there's no difference between those two. There is, Your Honor, and that's actually the problem in this case. What the company has suggested is that the parties, when they negotiated their new contract in 2021, came up with this list that excluded all of the memorandums of agreement that weren't specifically enumerated in that document. They appended a list to their new contract of all those MOUs. What did not happen was an agreement by the parties to exclude the prior arbitration. That's about agreements and what are terms of the contract. I'm asking a factual question. Is there anything in the record or out of the record that shows the Energy Harbor paid more for its health care plan in 2022 than it paid for 2021? There's nothing in the record about what Energy Harbor paid because what happened was the arbitration decision came out during 2022 after the company had already started making its contributions. So what the union was grieving was the company failed to take account of what the arbitration award required in 2021, which would then impact on the rate that would be charged. Right. But you're grieving that 2021 number coming out of the arbitration is what you just said. Yes. OK, what would be? Yes. What would be the rate once the company integrated the arbitration award and recalculated its 2021 cost? I got it. The problem then is, though, this this case is about whether. You know, whether the question, you know, arises out of the interpretation, application or operation of this, the 2022 agreement. Couldn't agree more. OK, but this seems like it's about a fact or something that predates this agreement. It's not about how do we read the words or apply them to the agreed upon facts. It's about the OK. There's really no dispute about the wording in this document. It's about some stuff that precedes it, that this document is then operating on in a pretty undisputed manner. I was OK with everything you said, your honor, up until you said in an undisputed manner that the grievance addresses whether the company has met its contractual obligation for 2022 opt up. Whether it has met its obligation. I agree. You are disputing. You're saying they haven't met it. But how is that about interpreting this agreement or applying? It's a dispute about interpreting this agreement or dispute about applying this agreement to dispute about how this agreement operates. How does how does it fit those? Because, your honor, in in the specific language of Article eight to see a excuse to a in that specific language, the employer is committing and obligated to make contributions to a third party provider. They're not contributions to the union. They're to the third party provider in an amount equal to what the company was paying for its internally sponsored health insurance plan. The twenty twenty one arbitration dealt with whether the company had altered the health insurance plan in an unacceptable way. And the arbitrator found that the company had and therefore the company had to recalculate what it was obligated in twenty twenty one. What that meant was when you're looking at twenty twenty one to twenty twenty two, you now have a discrepancy. And that's exactly what the union was challenging, saying in twenty twenty two. Now you have you the company have to pay to the third party provider an amount equal to the value of these this health insurance plan as it should have been calculated at the end of twenty one. And again, your honor, interestingly, all of this happened after the arbitration award came out, after the company began paying in twenty twenty two. And if I may, your honor, the problem that you raise illustrates the fundamental flaw to the company's position. Let's say that the company goes in front of an arbitrator and says we didn't have we didn't have an increase from twenty twenty one to twenty twenty two. And the union says, oh, contrary, you did have an increase. And the company says we can prove we didn't. The union still has a right, as the Supreme Court has established to arbitrate, even if the grievance. And I don't concede for a minute that it is. But even if that grievance was meritless, the union would still be entitled to bring a grievance saying you did not meet your contractual obligation for twenty twenty two. I want you paid to the third party provider. The what the company is asking the federal courts to do is step away from their judicial authority and and be arbitrators. But but I want to I want to focus on the language that you're disputing, whether the plan incurred an increase in twenty. You know, I don't see how it incurred an increase under the agreement. You're talking about things that are preceding the agreement and you're sorry. Go ahead. Sorry. The agreement took effect in October twenty twenty one when there was a an opt out for twenty twenty one for which the company had to pay contributions to a third party provider. And the arbitration case dealt with that dispute about whether the amount going in twenty twenty one was the correct amount. But you're now within the term of the contract. You're now October one of twenty one in the term. The company's making their contributions. Now you get to twenty twenty two and in mid year the arbitration award is issued, saying what the company paid or what the company calculated its insurance to cost for twenty one was an error because it was an error. The company wasn't, in the union's view, privileged to rely on the fact that it the company what it was paying everyone else did not change. The company had to make a change based on the arbitration award during the term of this agreement. And when they refused, the union grieved that act, which falls right into the analysis of if you start out with you have a broad an arbitration clause that is broad in scope. And you have a presumption of arbitrability. The very first question is, does this grievance implicate a provision of the agreement? The grievance says you're not meeting your obligation for contract year twenty twenty two. As I understand it, there's an increase from twenty twenty to twenty twenty one. But there's no increase from twenty twenty one to twenty twenty two. There's no increase in what the company paid to other participants. What the unions grieved and what was arbitrated in twenty one was you altered your plan and made it something other than you were required to maintain. And as a result of altering it, you reduce the amount of money that you had to pay. The arbitrator agreed and said, now you've got to make a corrective action. You've got to actually the corrective action. The arbitrator order was you have to reimburse the employees who now had to pay more for the benefit in twenty one than they should have. Right. But this is about an arbitration under a prior framework agreement about the interpretation, applicability and operation of the framework agreement. Right. But you're trying to arbitrate under an arbitration agreement in the twenty twenty two. Not not at all, your honor. There's no attempt to invoke the framework agreement. The effort is to say that the arbitration award that set what the obligation was supposed to be for twenty one, then created a difference between what should have been paid in twenty one and what the company was proposing to pay in twenty two. So it's really a classic garden variety contract interpretation question for an arbitrator. And if I may, your honor, the the third and fourth issues that the company raises, they say that the magistrate judge and then the district court assumed there was an increase. And because they assumed there was an increase, the court assumed a fact not in the record that would have allowed the company to escape the presumption of arbitrability. That's not, in fact, what the district court did. What the district court did was to say the language refers to an increase in contributions and the union's grievance challenges whether that language was met. And it places that dispute squarely within the contract. If you look at the cases that the that the the appellant, the company cited, they rely mainly on three cases. They rely on farmland foods. They rely on cop and then they rely on Rite Aid. And if you look at all three of those cases in each of those instances, the court determined that they were talking about a benefit that was created outside of the agreement. And in farmland foods, the union was seeking something called a deferred wage pension contribution. And the court said such a benefit doesn't exist in this contract and therefore no presumption of arbitrability. In this case, you have Article 8 C2A that clearly provides an obligation for the company to pay an amount to be determined into to the third party provider. And I would submit, Your Honor, if the court could tell from this contract, this CBA, what that amount is in dollars and cents, this might be a different argument. But in order to figure out what the company owes to the third party provider for 2022 contributions, you have to go outside of the contract. You have to look to extrinsic evidence. What the court is getting from the company in this appeal is a free look at the merits of its argument to an arbitrator. This is the company's case to an arbitrator. The union certainly has a response. But the issue for this court is, has the grievance raised an issue about a benefit created under this agreement? And the union certainly has. Do you have a broadly worded arbitration clause? And the parties do. And is there anything in any of that language that suggests that there's some subject matter, in particular health insurance contributions, that ought to be excluded from arbitration? And there isn't. I would ask the court to consider its own decision in E.M. Martin, which we've cited, where the court says that it rejects the invitation to look at the bargaining history as forceful evidence because the court notes all its forceful evidence of is how the company viewed its own position. It's not forceful evidence of an agreement by the parties to exclude this dispute from arbitration. That's what's missing here. There's no indication in this record anywhere that the parties agreed that disputes that come up under Article 8C2A can't be arbitrated. And that is exactly what this grievance cites to. It lists the article, it lists the section, and it lists the act that the company did of failing to adjust the contribution rates. Tony, do you have anything else? Thank you. All right. We thank you. I'm going to try to focus on the main points that I want to raise. There's a lot there. First thing, 8C2A refers to an increase in the plan contribution rates. The plan at issue in that contract is the Energy Harbor Plan. That did not change. And basically that was admitted, I think, reluctantly by my friend on the other side. 8C2A does not apply. If you look at the grievance itself, which is quoted, it's in the record, it's quoted in the briefs, the grievance references the arbitration award and the framework agreement. That is what they relied on as a source of that contribution. And I think an important point is the only people that received the increase for 2021, which is what the arbitration limited the award to, 2021 only. It was limited to 2021, and that was only for the locals that filed the grievance. The rest of the company received what the plan rates were and the opt-outs to the extent they had. You continue to refer to the grievance and specifically to that portion of the nature of the grievance. And I don't dispute how you've characterized it as focusing on the arbitration award and its number. But you give no weight whatsoever to the contract reference to 8C2A. And I don't quite understand how with something that is as relatively informal as a grievance, and I've seen plenty of them there, that I can't say that they're usually models of draftsmanship. They're not subject to the rules of civil procedure. We don't look at them as we do pleadings. So I'm just wondering how you can completely ignore the contract reference in the grievance. Well, again, I think that the reason that that provision isn't given weight is it's inapplicable by its own terms because it applies to increases from the plan only. And this would not be an increase from the plan. And what the arbitrator ruled was that a framework agreement saying same benefits have to be provided didn't mean that the same construction of the health care plan, which is what the company did, they replicated the first energy health care plan, wasn't enough. And didn't accept the argument that because there was a different population of employees who happened to be healthier and had a different set of demographics, that the cost for that same exact plan for energy harbor would be less than it would be for first energy because they had people climbing poles and doing things that were more dangerous and their rates were higher, their injury rates and everything else. So that arbitrator didn't recognize those differences. So for 2021, she simply said you have to also pay the first energy rates, whatever those are. But for 2022, work it out amongst yourselves. She expressly denied extending the award past 2021 and said you need to work among yourselves for that. So that cannot be the basis for triggering any kind of increase to another plan under 8C2. That's why it's not applicable, 8C2A. All right. All right. Any other questions? We thank both counsel for their helpful briefing and argument. We'll take the matter under advisement and we'll recess. But before we do that, we'd like to greet both counsel at sidebar and thank you for your advocacy.  Thank you.